# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **GETA BARR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:16-CV-1340-VEH** |
| | ) | |
| **FLORENCE JOHNSON, TRINA** | ) | |
| **PAULDING, THE CITY OF** | ) | |
| **CENTER POINT, THOMAS** | ) | |
| **HENDERSON, and JOHN** | ) | |
| **WATKINS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## <u>MEMORANDUM OPINION</u>

### I.   INTRODUCTION

This case arises from a dispute over a barber shop in the City of Center Point.

Before the Court are several motions. Defendants City of Center Point (the "City"),

Thomas Henderson, and John Watkins filed a motion for summary judgment. (Doc.

61). Additionally, Defendants Florence Johnson and Trina Paulding filed a motion

for summary judgment. (Doc. 62).[1] Plaintiff Geta Barr filed two separate motions to

strike the affirmative defense of justification outlined in the motions for summary

---

[1] For the reasons stated in this opinion, this motion is **CARRIED** with the case on
**REMAND** to the Circuit Court for Jefferson County, Alabama.

judgment. (Docs. 65, 66).[2] Finally, the City, Henderson, and Watkins filed a motion to strike evidence attached to Barr's response opposing summary judgment. (Doc. 70). All five motions are under submission and ripe for review.

For the reasons stated in today's opinion, the motions are granted in part and denied in part. Further, the Court determines that the proper course of action is to remand the remainder of the case to the Circuit Court of Jefferson County, Alabama.

## II.   RELEVANT BACKGROUND[3]

### A.   Facts Pertinent to the City Motion

In 1986 Barr moved from her native Jamaica to Miami, Florida. In 2008 she moved from Miami to Birmingham, Alabama. Barr describes her occupation(s) as: cosmetologist, barber, and income tax preparer. Upon first arriving in Birmingham,

---

[2]   For the reasons stated in this opinion, these motions are **CARRIED** with the case on **REMAND** to the Circuit Court for Jefferson County, Alabama.

[3]   The facts set out herein are gleaned, in substantial part, from the facts proffered by the parties. To the extent that a party has proffered a fact which is not disputed it has been included without citation. To the extent that a fact proffered by a party was disputed by another party, the Court first examined the proffered fact to determine whether the evidence cited in support of that fact actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact, with citation to the evidence supporting the fact as proffered. If the cited evidence was disputed by contrary evidence, the evidence was viewed, as this Court must, in the light most favorable to the non-movant, with citation to such supporting evidence. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant and/or immaterial, may have been omitted. Further, as necessary, the Court may have included additional facts cast in the light most favorable to the non-movant.

Barr rented a barber's chair at a studio in the Birmingham neighborhood of Woodlawn. After briefly opening her own barber shop outside of Center Point, she then opened a barber shop and beauty salon at 1855 Center Point Parkway on August 22, 2008. A very short time after that, she moved the shop to 1849 Center Point Parkway, which was located in the same shopping center.

From 2008 to 2014, 1849 Center Point Parkway was Barr's only location. From that location she operated both Barr Sisters Barber and Style, and Maxi Tax Resources, an income tax preparation service which was only open during tax season, January to April. In 2014, she opened "Barr Sister's Barber and Style II" at 1687 Center Point Parkway.

Starting in 2014, 1687 became the location of the barbershop, while 1849 was the location of the cosmetology salon. Barr testified that, due to this separation, she did not need a license from the Jefferson County Barber Commission ("JCBC") to operate 1849, and that she did not need a license from the Alabama Board of Cosmetology to operate 1687. Barr testified that the JCBC came to her shop "all the time … [looking for] sanitation and stuff like that …." On July 25, 2014, Kay Wallace, an inspector and office manager for the JCBC, inspected Barr's 1687

location. On August 19, 2014, Trina Paulding,[4] another inspector for the JCBC, came to Barr's shop at the request of Wallace. Barr was in Florida on August 19th. Barr testified that she was the only person who worked at Barr Sisters with a journeyman barber license, and thus was the only one who could oversee students.

When Paulding arrived at 1687 on August 19th, Barr was not there, but Paulding found that the shop was open for business, and that there was one student barber[5] in the shop (along with his friends) without a journeyman barber present to supervise him. (*See* Barr Depo. at 63-65). A man named Chico, who worked at the barber shop, was also there for a short time, but he was not able to oversee students because only Barr could do that. (*See id.*). At that time, Paulding did not get the names of any of these individuals. (*See* Paulding Depo. at 52). Barr testified that "Smith was not supposed to be at work that day .... They weren't supposed to be there," and that the barbershop was supposed to be closed. However, despite Barr's directives, Chico "opened the door [for Smith] and left" Smith and his friends to

---

[4] Prior to being hired as a Barber Inspector, Paulding worked in a warehouse. Her training by the JCBC consisted of shadowing the Office Manager for two weeks. (Doc. 63 at 10 ¶28); (Doc. 68 at 2 ¶68). She has never been a licensed barber. (Paulding Depo. at 7). Under Alabama law, "[t]he county health officer of the county shall appoint and at his or her pleasure discharge inspectors." ALA. CODE § 45-37-40.02(d). "The inspectors, subject to the approval of the commission, shall be practicing barbers who have had five or more years of experience as a barber." *Id.*

[5] "A student work permit may be issued to a student who is in attendance at a barber college for a fee of ten dollars ($10) each year, provided the student has at least 850 hours of credit in barber college." ALA. CODE § 45-37-40.04(b).

operate the shop. Paulding testified that it is hazardous for people without licenses[6] to practice as a barber. (*See* Paulding Depo. at 55:23 to 56:3).

Paulding wrote Barr a violation of $50 for having a student barber present without a journeyman barber to supervise him. On August 21, 2014, Wallace came back to 1687 and found an unlicensed individual named Lateria Johnson braiding hair. Again, Barr was not present at 1687 at the time of Wallace's inspection. Barr testified that she had sent Johnson from 1849 to 1687 in order to braid a client's hair.

On August 25, 2014, Paulding came back to 1687 and gave Barr a written notice that she needed to appear before the JCBC the next day, August 26, 2014, between 9:30 and 10 AM. Barr appeared but requested the hearing be postponed for her attorney to be present. (*See* Barr Depo. at 78-79). The statute specifically states as follows:

> The commission, before denying an application for a license, or **before suspending or revoking any license**, shall set the matter down for a hearing, and at least **20 days prior** to the date set for the hearing, notify the applicant or licensee in writing, which notice shall contain an exact statement of the charges made and the date and the place of the hearing. The applicant or licensee at all hearings **shall have the opportunity** to be heard in person and **by counsel**.

ALA. CODE § 45-37-40.04(d) (emphasis added).

---

[6] According to the statute, students are given work permits. *See* Ala. Code § 45-37-40.04(b).

Barr testified that, at the hearing, JCBC Commissioner Florence Johnson said: "[we're] going to send the sheriff to shut you down."[7] When Barr left the JCBC on August 26th, she went back to 1687. She testified that at some point later that day Trina Paulding, Jefferson County Sheriff's deputies, Center Point building inspectors John Woods, John Watkins, and Center Point Inspections Supervisor Wayne Plunkett arrived at her 1687 location.[8] Barr testified that the deputies came in and ordered everyone to get out. She testified that everyone left, a notice was placed on the door, and the doors were then chained and locked. Barr testified that, although she saw Wayne Plunkett and John Watkins at the door with the chain and lock, she could not say "who put the lock together." After Barr went across the street to the 1849 building, the police entered that building and told her to leave and that if she were caught on the premises she would be arrested. (Barr Dep. p. 104:16-105:10). Barr was present when the doors to 1849 were chained and locked by the City, but she did not see precisely who locked the doors.[9] (Barr Dep. p. 106:7-16).

---

[7] Mayor Henderson testified that he did authorize city resources to assist the JCBC, but that there was not an understanding, on August 26, that Barr's businesses would be chained and locked. (*See* Henderson Depo. at 61-62).

[8] Defendants have failed to dispute, with evidence, the lack of a court order permitting the doors to be locked. (Doc. 63 at 12 ¶79); (Doc. 68 at 3 ¶79). The parties agree that the City Council had not passed a resolution to revoke Barr's business license on August 26, 2014. (Doc. 63 at 12 ¶80); (Doc. 68 at 3 ¶80).

[9] There is some indication that she did not look because it was upsetting to see another one of her businesses shut down. (*See* Barr Depo. at 106:7-16).

On August 26th, Barr retained attorney Henry Penick, an attorney she had worked with before, to represent her. Barr and Penick went to the JCBC the next day to request an emergency meeting, but Wallace said that the earliest date on which the hearing could occur was September 4, 2014.

On September 4, 2014, the JCBC agreed to re-open Barr's businesses if she paid a $250.00 fine. (Barr Depo. at 108:16-109:17).[10] City Inspector John Watkins was present when this agreement was stated. (*See id.* at 113:11-23). At some point on September 4th, the locks on her doors were removed, but Barr was not present for their removal. A Center Point City Council meeting regarding Barr's businesses and her business licenses was initially scheduled for September 11th, but was rescheduled to October 9th. Barr was notified of the changed hearing date by Center Point City Attorney Frank Russo. Barr appeared at the hearing on October 9th with her attorney Penick. Penick was given an opportunity to speak at the City Council meeting.

There was a business license meeting before the City Council on October 9. (*See* 10-9-14 Minutes). At that meeting, the sign issues, compliance with licenses, and the production of the records of revenue[11] were discussed regarding Barr's businesses.

---

[10] Only the City Council has the authority to revoke a business license by majority vote. (Doc. 63 at 11 ¶74); (Doc. 68 ¶74).

[11] It is unclear whether the City affirmatively told Barr that she needed to produce these records. (*See* 10-9-14 Minutes at 5) ("The City could also require Ms. Barr to produce records of revenue.").

(*See id.* at 5). At the meeting it was discussed that "[i]f not in compliance at that time, the business licenses will be revoked and the businesses closed." (*See id.* at 6). By unanimous vote, the City Council gave Barr until "October 17, 2014, at 5:00P.M. to comply with all city ordinances." (*See id.*) (emphasis and capitalization omitted).

Barr testified that she never produced all requested revenue records.[12] On October 17, members of the Center Point Inspections Department put a cease and desist notice on the door of both her 1849 and 1687 locations. (Barr Depo. at 129-131).[13] Additionally, the 1849 location was chain locked. (Hinkle Depo. at 26:15-20). The parties agree that, at that point, the City Council had not passed any new resolution finding Barr to be noncompliant or explicitly shutting down her businesses. (*See* Doc. 61 at 7 ¶35); (Doc. 63 at 7 ¶35); (Hinkle Depo. at 48-49). On October 17, Barr had no customers in her shop at 1849. (*See* Barr Depo. at 127). Barr testified that she and her son were "trying to make sure everything was in compliance." (*See* Barr Depo. at 127).

On October 23, 2014, the Center Point City Council met again. (10-23-14

---

[12] However, Barr does believe that she came in compliance regarding the sign issue. (Barr Depo. at 124). That being said, there is some indication she was not given any notice on October 17th that she was not in compliance. (*See* Hinkle Depo. at 49:19 to 50:10).

[13] Watkins' signature is on at least one of the cease and desist orders. (*See* Wakins Depo. at 80:9 to 82:8); (*See also* Doc. 63-5 at 57-58). There is also evidence that he was present when the doors were chain locked. (*See* Hinkle Depo. at 46-49).

Minutes).[14]  The City Council unanimously passed the following motion:

> Barr Sisters Barber & Style and Barr Sisters Barber & Style II granted until Friday, October 31, 2014[,] at 1P.M. to present all required information. If not in compliance at that time, the resolution to revoke the business licenses will go into effect[.]

(*Id.* at 3) (emphasis and capitalization omitted).

After this vote, Barr was allowed to reopen her businesses. During the week of October 17th to October 24th, when the store was allegedly closed, Barr received a credit card payment. She testified alternatively that the deposit came from 1) someone paying her son Vincent, 2) someone who gave her money to buy food out of charity, or 3) somebody who owed her money from working on their hair previously. While Barr does not sell good directly to customers in her store, she does engage in bulk purchasing and selling. (Barr Depo. at 226-228). She sold thousands of dollars of these goods from the 1849 location. (*See id.*).

Both Barr and Penick were present at the October 9th City Council meeting in which revenue records were discussed, and Penick was also told directly that Barr needed to produce income tax records. Barr testified that she did not produce all of the necessary income tax records in order to come into compliance by October 31st. She stated that she "couldn't come up with the last one." Barr asked Mayor

---

[14]  Mayor Henderson does not know whether Barr was given notice of this meeting. (*See* Henderson Depo. at 119:18-23).

Henderson on October 31st if he could give "me some extension so I could try to come up with the [tax return] that I'm missing, he said that order is already out …."

On October 31st, Wayne Plunkett, John Watkins, and the Jefferson County Sheriff's Department came to Ms. Barr's barber shop. (*See* Barr Depo. at 147). At that time, both businesses were chained and locked. (*See id.*). The 1849 location was not open for business on October 31st. Barr testified that the doors were locked, but did not see who locked the doors. Although Barr admits that the doors were unlocked at some point prior to November 8th, she stated that she did not actually know when they were unlocked.

N-Rel Property Management chained and locked the doors to 1687 on either November 9 or November 21, 2014. (Better Business Bureau Complaint at 2) ("I was illegally evicted by In-Rel Properties . . . November 9, 2014[.]"); (Barr Depo. at 154); *but see* (*id.*) (discussing the events of November 21, 2014).

Barr applied for, and was issued, two business licenses from the City of Center Point on October 17, 2014, for Barr Sisters Barber & Style I and II to operate at both the 1849 and 1687 locations. (Doc. 63-2 at 171-72). Both were set to expire on December 31, 2014. (*See id.*). The business license for Maxi Tax Resource was not affected by these events. Barr was able to continue operating Maxi Tax Resource at 1849 before the beginning of tax season. Center Point continued to renew Maxi Tax's

business license, and Barr continued to operate Maxi Tax Resource at 1849 in 2015 and 2016.

Barr has apparently not had a journeyman barber license from JCBC since 2014. "[M]y main problem that I have is with JCBC because they still have not renewed my business license, so there's no way I could even hire a barber." At the time of her deposition she did not have a barbershop business license from the JCBC for 2017.

Barr testified that Maxi Tax consisted of the bulk of her income, and that Barr Sisters Salons generally operated at a loss. Barr testified that her tax returns consist of her entire income. (*See* Barr Depo. at 192-193); (*but see* Barr Depo. at 191-192) ("Q. So all the income that you made from Barr Sisters is reflected in your income tax returns? A. The majority of it. Unless I made tips, I keep my tips, I don't put that in there.").[15]

Barr testified that she has no knowledge regarding how the City of Center Point trains its employees. Barr testified that the only way in which she was paid from Maxi

---

[15] Barr has conceded that the only income which she is claiming as a loss in this lawsuit is contained in her income tax returns. Barr alleges that she lost clients due to the relocation of her hair salon, but testified that her former clients did not tell her why they stopped patronizing her for hair and cosmetology services. Barr alleges that she lost clients from her Maxi Taxi business but did not make a list of those clients (and did not have the names memorized). (*See* Barr Depo. at 312-13). She did testify that some of her clients told her that they believed the IRS had shut her down and would not come back for that reason. (*See id.*).

Tax was as an employee. Barr testified that the only way in which she was paid from Barr Sisters was as an independent contractor. Thus, Barr did not sustain personal losses from the failure of the businesses outside of an alleged loss in personal income. Barr owns all businesses jointly with Cynthia Barr (her sister), Terry Harris (her fiancé), Audia (her daughter), and Vincent Brockett (her son). None of the other owners were named as parties to this lawsuit. Barr alleges financial damages, emotional distress, and loss of income resulting from these occurences. The majority of Barr's claimed damage is $43,000 per year of total financial damages to the businesses, which does not include her alleged personal lost income. She alleges that her personal lost income is between $15,000 and $20,000 from hair clientele. Barr testified that she first started seeing a psychiatrist in December of 2016, more than two years after her business licenses were revoked.

## III. STANDARDS

### A. Motion To Strike

It has long been the law in this circuit that, when deciding a motion for summary judgment, a district court may not consider evidence which could not be reduced to an admissible form at trial. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). But, until 2010, Rule 56 lacked a formal procedure to challenge such inadmissible evidence. In 2010, the advisory committee added Rule 56(c)(2),

which provides:

> A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

Fed. R. Civ. P. 56(c)(2).

### B. Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must

designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce

"significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## C.    Qualified Immunity

"The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id.*

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004). Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Under the *Saucier* test, "[t]he

threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the individual defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law. *Anderson v.Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271 (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public official would not have believed her actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639,107 S. Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable

for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' at the time it was taken[.]") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.") (emphasis added); *see also Johnson v. Clifton*, 74 F.3d 1087,1093 (11th Cir. 1996) ("We know of no [preexisting] case which might have clearly told Clifton that he could not take the disciplinary action indicated by an investigation which was initiated before he even knew about the allegedly protected speech, and in circumstances where the public concern implication was doubtful.").

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise

their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's modification of *Saucier*'s analytical process, the substantive analysis remains unchanged; an officer is entitled to qualified immunity protection as long as he "could have believed" his conduct was lawful. *Hunter v. Bryan*, 502 U.S. 224, 227, 112 S. Ct. 534, 536, 116 L. Ed. 2d 589 (1991).Therefore, to deny immunity, a plaintiff must affirmatively demonstrate that "no reasonable competent officer would have" acted as the public official did. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

## IV.   ANALYSIS

### A.   Defendants' Motion To Strike Is Granted in Part and Otherwise Denied

Defendants moved to strike some of Barr's exhibits used in her response to the motion for summary judgment. (Doc. 70 at 1). Defendants also moved to strike the "arguments supported by these exhibits." (*See id.*). The motion challenges two exhibits. (*See id.* at 1-6). The Court will address each in turn.

#### 1.   JCBC Minutes

Defendants first move to strike "alleged statements made by Henderson and

Watkins from [the] purported JCBC minutes" from the meeting on August 26, 2014.

(Doc. 70 at 1) (emphasis and capitalization omitted). The Defendants note that Barr

has not actually submitted the JCBC minutes into evidence, she is relying on

statements from depositions about what those minutes allegedly said. (*See id.* at 1-2).

There are essentially two statements that the Defendants contest. The first is a

statement allegedly made by Watkins at the meeting. (Doc. 70-1 at 4). The second is

a statement that was allegedly made by Henderson to Paulding who then relayed the

statement at the meeting. (Doc. 70-1 at 2-3).

Defendants have several arguments for why statements from these documents

are inadmissible. (*See* Doc. 70 at 2-4). The Defendants argue that Barr is unable to

authenticate the minutes. (*See* Doc. 70 at 2). Rule 901 speaks to the issue of

authentication. *See* FED. R. EVID. 901(a) ("To satisfy the requirement of

authenticating or identifying an item of evidence, the proponent must produce

evidence sufficient to support a finding that the item is what the proponent claims it

is."). In response to the authentication argument, Barr argues that Paulding "testified

that she recognized the . . . exhibits as the official minutes of the Barber Commission

that were provided through her counsel during discovery" and for that reason "the

Barber Commission Meeting Minutes can be authenticated at or prior to trial." (*See*

Doc. 74 at 3). This indicates to the Court that Barr is attempting to authenticate the

document via Rule 901(b)(1). *See* FED. R. EVID. 901(b)(1) ("**(1) Testimony of a Witness with Knowledge.** Testimony that an item is what it is claimed to be."). The Defendants argue that Barr is misrepresenting testimony to the Court. (*See* Doc. 75 at 4) ("It is troubling to say the least that Plaintiff has represented Ms. Paulding's testimony as authenticating these records, when she clearly did not."). Here is the relevant deposition testimony:

> Q. Go ahead and look at Plaintiff's 7.
>
> A. Okay.
>
> Q. Read the last sentence of Plaintiff's 7. It says the next line of business?
>
> A. Okay.
>
> Q. Of course, Plaintiff's 7 is from the Barber Commission of Jefferson County. It's dated August 26th, 2014, correct?
>
> A. Yes.

(Paulding Depo., Doc. 61-4 at 38:5-13). The Court does not see where, in any of that testimony, Paulding authenticates the minutes. Additionally, Paulding testified as follows:

> Q. Would you agree that the Barber Commission meeting minutes are accurate?
>
> . . .

[A.]    I can't say.

Q.    Do you know who wrote these minutes?

A.    No, I don't.

Q.    Whose responsibility was it to record meeting minutes of the Barber Commission?

A.    Kay Wallace.

Q.    Was it Kay Wallace's job to quote the meeting minutes of the Barber Commission on August 26th, 2014?

A.    I guess, yes.

Q.    Did anybody else beside Kay Wallace take meeting minutes, to your knowledge, of the Barber Commissioner activities on August 26, 2014?

A.    Not to my knowledge.

(Paulding Depo. at 39:10 to 40:2). There is no indication that Paulding has ever seen these minutes before. In sum, Barr has proffered an exhibit, Defendants challenged Barr if she could authenticate that exhibit, Barr chose to try to authenticate that exhibit through the testimony of a witness, and that testimony does not authenticate the exhibit. Accordingly, the Court **GRANTS** the Defendants' motion as it pertains to the unauthenticated JCBC minutes.[16]

---

[16]  This does not mean that the purported statements from Henderson and Watkins are excluded, but they must not be based off an unauthenticated exhibit (and they must not run afoul of the rule against inadmissible hearsay).

## 2.     Barr Affidavit

Defendants also move to strike Barr's affidavit on several grounds. (Doc. 70 at 4-6).[17] They argue that it is a sham affidavit, contains opinions, and runs afoul of the rule against hearsay. (*See id.*).

First, the Defendants argue that this is a sham affidavit[18] because it is inconsistent with prior deposition testimony. (*See* Doc. 70 at 4-5). Defendants argue that there are two offending statements. (*See id.*). The affidavit states: "I couldn't even take my scissors and supplies out of my shop and go work somewhere else." (Doc. 67-1 at ¶11). Defendants argue that this is inconsistent with her deposition testimony about the police permitting people to pack up and leave. (*See* Doc. 70 at 4-5) (citing Barr Depo. at 83, 90, 105). Barr responds by stating that this testimony is not inconsistent. (Doc. 74 at 4).[19] Defendants note the "vast difference between

---

[17] Defendants broadly ask the Court to strike the entire affidavit, but "at the least, [they] request that Paragraphs: 3-6, 8, and 10-16 be struck." (Doc. 70 at 6).

[18] "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs. Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

[19] Barr argues:

Rather she testified as to what the police said, what everyone else did in response to their command, and what she was doing at the time the police came in. Contrary to their argument, plaintiff never stated she removed the tools of her trade prior to being shut down.

having the opportunity to remove the items, but not removing the items, and being denied the opportunity to remove the items." (Doc. 75 at 7). The Court agrees that there is a big difference here, but Barr's affidavit never said she was not given the opportunity to remove the items. It said that she could not remove the items. Why she could not remove the items remains a mystery, but from reading the deposition it is clear it was not because the police did not give her a chance to do so. (Barr Depo. at 83-84, 90). For that reason, the Court **DENIES** the motion to strike this statement.

The affidavit also states: "When I was locked out of my hair salon at 1849 Centerpoint Parkway on October 17, 2014, I could not re-enter my property for at least 7 days." (Doc. 67-1 at ¶8). Defendants state that this is inconsistent with her deposition testimony, specifically the part about being locked out on October 17. (*See* Doc. 70 at 5) (citing Barr Depo. at 131). The Court notes that the Defendants' cited deposition testimony at page 131 of Barr's deposition is talking about her business at 1687. (*See* Barr Depo. at 130:23 to 131:14). The cited line from her affidavit is talking about her business at 1849. (*See* Doc. 67-1 at ¶8). There is no inconsistency here. In reply, the Defendants address this argument in a footnote. (*See* Doc. 75 at 7 n.8). They rely on page 131 of her deposition (which read in context appears that she was talking about a different business) and page 142. (*See id.*). The Court does not

---

(Doc. 74 at 4).

see where page 142 directly contradicts the affidavit testimony either, and the Defendants do not explain why. (*See* Barr Depo. at 142); (Doc. 75 at 7 n.8). The motion to strike this line is **DENIED**.

Second, Defendants move to strike the reference to the alleged statements in the JCBC minutes as double hearsay. (*See* Doc. 70 at 5). The affidavit states: "The defendants openly stated they were sick of me and were more than happy to lock my doors." (Doc. 67-1 at ¶16). While the statements from the defendants are admissible under Rule 801, it appears that this is an instance of double hearsay because Barr heard from another source that the Defendants said those things. Barr needed to give a second exception to the hearsay rule to surpass that second level of hearsay. She only relied on Rule 801(d)(2)(A), which could get her past the first level of hearsay (the Defendants' statements), but not the second (where the Defendants' statements were relayed through Wallace). (*See* Doc. 74 at 5). Accordingly, the motion to strike the sentence reading: "The defendants openly stated they were sick of me and were more than happy to lock my doors" is **GRANTED** and the sentence is hereby **EXCLUDED**.

Finally, Defendants move to strike "[p]aragraphs 12, 13, 15, and 16" because they "do not contain any facts." (Doc. 70 at 5-6). They also move to strike her opinions in the affidavit. (*See id.*). Barr maintains that her opinions are admissible

under Rule 701 and that paragraphs 12-16 are facts. (*See* Doc. 74 at 6). Upon review, the Court notes that paragraphs 12-16 are essentially Barr discussing the impact of the relevant events on her life. (Doc. 67-1 at ¶¶ 12-16). To the extent that Barr states that she was "illegally locked out" the Court **GRANTS** the motion in part and strikes the word "illegally" because that is a legal conclusion. (*See* Doc. 67-1 at ¶¶ 6, 15). The motion is otherwise **DENIED**.

### B. The City/Henderson/Watkins Motion for Summary Judgment Is Granted in Part and Otherwise Denied

#### 1. Claims Against the City

##### a. Federal Claims

###### i. *Substantive Due Process*

The City moves for summary judgment on the substantive due process claim. (Doc. 61 at 16-17). The City argues that since "Barr's allegations stem from the loss of her business license, a property interest created by state law, she failed to establish a substantive due process violation." (*Id.* at 17) (citing *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994)). The Eleventh Circuit stated in *McKinney*:

> In short, areas in which substantive rights are created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because "substantive due process rights are created only by the Constitution." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985) (Powell, J., concurring). As

a result, these state law based rights constitutionally may be rescinded so long as the elements of procedural—not substantive—due process are observed.

*McKinney*, 20 F.3d at 1556. The City argues that the source of this right comes from the Alabama Code. (*See* Doc. 61 at 16) (citing ALA. CODE § 11-51-90(a)(1) ("(a) All municipalities shall have the following powers: (1) To license any exhibition, trade, business, vocation, occupation, or profession.")).

Perhaps seeing the writing on the wall after this Court's previous Memorandum Opinion and Order from April 25, 2017, that dismissed other substantive due process counts,[20] Barr argues that this was a liberty interest. (*See* Doc. 63 at 17-18).[21] She argues that the City "completely prohibited Barr from conducting any and all business whatsoever at 1687 and 1849 Center Point Parkway" (*see id.* at 18) and that this violates her "fundamental right to earn a living." (*see id.* at 17).

The substantive component of the Due Process Clause protects only those interests that are "fundamental" and "implicit in the concept of ordered liberty." *McKinney*, 20 F.3d at 1556 (citing *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 152, 82 L. Ed. 288 (1937)). Substantive due process protection over a right

---

[20] (Doc. 35 at 12-15).

[21] Additionally, in counts including similar wording, the Court previously read the Complaint to raise a property, not liberty, substantive due process issue. (*See* Doc. 35 at 13) ("Contrary to Ms. Barr's construction, her Complaint alleges deprivations of a property, not a liberty, interest.").

means that the right is protected "against certain government actions regardless of the fairness of the procedures used to implement them." *Id.* (internal citations omitted). Though most of the rights enumerated in the Bill of Rights are considered fundamental, as well as certain other unenumerated rights, the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Id.* (citing *Collins v. City of Harker Heights*, 503 U.S. 115, __ , 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261 (1992)).

"The Supreme Court has recognized that the liberty component of the Fourteenth Amendment's Due Process Clause includes the right to pursue a profession." *Ming Wei Liu v. Board of Trustees of Univ. of Ala.*, 330 F. App'x 775, 780 (11th Cir. 2009) (citing *Conn v. Babbert*, 526 U.S. 286, 291-92 (1999)). At "summary judgment, a claimant must present evidence suggesting that a governmental act effectively banned him or her from a profession." *Id.*

The City argues that Barr could "find new work in her field of choice." (*See* Doc. 68 at 7). This is supported by the Barr's own testimony:

Q.     Are you still in the cosmetology business currently?

A.    Yes.

Q.    Is that still your main profession, would you say, or what would you list your profession as?

A.    I'm a licensed cosmetology and a barber and income tax preparer.

(Barr Depo. at 16). Barr argues that the City prevented her two business locations from running, but she does not argue that the City prevented her from barbering or preparing taxes everywhere. (*See* Doc. 63 at 15-18). In other words, Barr has not shown that she could not continue her work as a barber, cosmetologist, or income tax preparer. Without this showing, summary judgment in favor of the Defendants is appropriate.

For the aforementioned reasons, the Court **GRANTS** summary judgment to the City on Barr's substantive due process claim.

### ii.    *Procedural Due Process*

The City also moves for summary judgment on Barr's procedural due process claim. (*See* Doc. 61 at 17-19). In support, the City argues that Barr had adequate post deprivation remedies but did not take advantage of them. (*See id.*) (arguing that "[f]iling for a temporary or permanent injunction, or filing a petition for a writ of certiorari in the Jefferson County Circuit Court . . . would have been a meaningful post-deprivation remedy"). In response, Barr argues that she "possessed a

constitutionally protected interest in [1687 and 1849 Center Point Parkway]." (*See* Doc. 63 at 20).

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965)); *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994) ("Due process entitles an individual to notice and some form of hearing before state action may finally deprive him or her of a property interest.").

As the Eleventh Circuit has explained,

> Although the Due Process Clause generally requires notice and an opportunity to be heard *before* the government seizes one's property, *see, e.g., Quik Cash Pawn & Jewelry, Inc. v. Sheriff of Broward County*, 279 F.3d 1316, 1322 (11th Cir.[ ]2002), the Supreme Court has "rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property." *Parratt v. Taylor*, 451 U.S. 527, 540–41, 101 S.Ct. 1908, 1915–16, 68 L.Ed.2d 420 (1981) (noting that its rejection of such a rule "is based in part on the impracticability in some cases of providing any preseizure hearing under a state-authorized procedure, and the assumption that at some time a full and meaningful hearing will be available"), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

*Reams v. Irvin*, 561 F.3d 1258, 1263 (11th Cir. 2009) (emphasis in original).

To establish a procedural due process claim, the plaintiff must show (1) "a

deprivation of a constitutionally-protected liberty or property interest"; (2) state action; and (3) constitutionally inadequate process. *Foxy Lady, Inc. v. City of Atlanta, Ga.*, 347 F.3d 1232, 1236 (11th Cir. 2003); *Artistic Entm't, Inc. v. City of Warner Robbins*, 134 F. App'x 306, 309 (11th Cir. 2005) (same). Even if a deprivation occurs, there is no procedural due process violation unless the state "refuses to make available a means to remedy the deprivation." *McKinney*, 20 F.3d at 1563; *see also Foxy Lady*, 347 F.3d at 1238 ("[E]ven if a procedural deprivation exists ..., such a claim will not be cognizable under § 1983 if the state provides a means by which to remedy the alleged deprivation."); *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000) ("It is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim.").

As the Eleventh Circuit observed in *Cotton*,

> [t]his rule (that a section 1983 claim is not stated unless inadequate state procedures exist to remedy an alleged procedural deprivation) recognizes that the state must have the opportunity to "remedy the procedural failings of its subdivisions and agencies in the appropriate fora–agencies, review boards, and state courts" before being subjected to a claim alleging a procedural due process violation.

*Id.* at 1331 (quoting *McKinney*, 20 F.3d at 1560); *see also Reams*, 561 F.3d at 1266 (citing *Horton v. Bd of Co. Com'rs of Flagler Co.*, 202 F.3d 1297, 1300 (11th Cir.

2000) (no federal procedural due process violation under *McKinney* if state courts "generally would provide an adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered")). The state's remedial process "need not provide all relief available under Section 1983; as long as the remedy 'could have fully compensated the [claimant] for the property loss he suffered,' the remedy satisfies procedural due process." *McKinney*, 20 F.3d at 1564 (citing *Paratt*, 451 U.S. at 544, 101 S. Ct. at 1917).

Here, Barr had a remedy available in the Alabama state courts. *See Sanders v. City of Dothan*, 642 So. 2d 437 (Ala. 1994). The following cases demonstrate the existence of a remedy. In *Sanders*, the Court recounted how a business owner was able to receive a temporary restraining order from the Houston County Circuit Court after her business license was revoked. *Id.* at 439. On appeal, the Supreme Court of Alabama considered Sander's due process arguments. *See id.* at 441-42. In *Spradlin*, the Supreme Court of Alabama reviewed a circuit court's ruling that refused to rescind the revocation of a business license. *See Spradlin v. Spradlin*, 601 So. 2d 76, 78 (Ala. 1992). Further, "Alabama appellate courts have held that a petition for a writ of certiorari is the proper method for seeking judicial review of municipal decisions as to which no prescribed method of review exists." *The Birmingham Derby Club, Inc. v. City of Birmingham*, 134 So. 3d 419, 421 (Ala. Civ. App. 2013) (citing

*Sanders*, 642 So. 2d at 440).

Barr attempts to justify her failure to seek a post-deprivation remedy by pointing out that she was not afforded a "pre-deprivation notice or hearing." (*See* Doc. 63 at 20-21); (*id.* at 22-23) (arguing that she did not have a pre-deprivation hearing before losing her business licenses). Barr cites to a case from the Court of Civil Appeals of Alabama. (*See* Doc. 63 at 21) (citing *Todd v. Kelley*, 783 So. 2d 31, 44-45 (Ala. Civ. App. 2000)). That case is neither binding authority, nor is it factually analogous (it was a case about a police officer who was dismissed). *See Todd*, 783 So. 2d at 33. Additionally, the Eleventh Circuit has stated that:

> The *McKinney* rule is not micro in its focus, but macro. It does not look to the actual involvement of state courts or whether they were asked to provide a remedy in the specific case now before the federal court. Instead, the *McKinney* rule looks to the existence of an opportunity - to whether the state courts, if asked, generally would provide an adequate remedy for the procedural deprivation the federal court plaintiff claims to have suffered. If state courts would, then there is no federal procedural due process violation regardless of whether the plaintiff has taken advantage of the remedy or attempted to do so.

*Horton*, 202 F.3d at 1300; *see also McKinney*, 20 F.3d at 1565 ("The fact that [the plaintiff] failed to avail himself of the full procedures provided by state law [i.e. the post-termination remedies] does not constitute a sign of their inadequacy."). For these reasons, Barr's argument fails.

Since Barr fails to adequately contend that there was no meaningful post-

deprivation remedy available, her procedural due process claim fails. Accordingly, the Court **GRANTS** summary judgment to the City on Barr's procedural due process claim.

### b. State Claims

### *i.* *Agency*

The City also moves for summary judgment on Barr's state law agency claim. (Doc. 61 at 19-21). In her response, Barr agrees that the claim is due to be dismissed. (Doc. 63 at 23 n.2). The Court reads this as a voluntary dismissal. Accordingly, the agency claim is **DISMISSED with prejudice**.

### 2. Claims Against Henderson

### a. Federal Claims

### *ii.* *Substantive and Procedural Due Process*

Henderson moves for summary judgment on these claims using the same arguments made by the City. (*See* Doc. 61 at 23). Barr responds by relying on her same arguments. (*See* Doc. 63 at 28-29). The Court previously explained these arguments above.

Accordingly, the Court **GRANTS** summary judgment to Henderson on Barr's substantive and procedural due process claims.

### *ii.* *Qualified Immunity*

Additionally, Henderson moves for qualified immunity. (*See* Doc. 61 at 21-23). He argues that he was acting in his discretionary authority and that any violation was not one "which no reasonable person in his position would make." (*See id.* at 22) (emphasis omitted). In response, Barr argues that Henderson was not acting in his discretionary capacity and that the law was clearly established. (*See* Doc. 63 at 27-28).

However, since the Court determines that there was no federal constitutional violation, it is unnecessary to proceed further in the qualified immunity analysis. *See Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000) (citing *GJR Investments, Inc. v. County of Escambia*, 132 F.3d 1359, 1366-67 (11th Cir. 1998)) ("And, of course, whether a defendant has violated a constitutional right at all is a 'necessary concomitant' to the question of qualified immunity: if a defendant has not violated the law at all, he certainly has not violated clearly established law."); *see also Melton v. Abston*, 841 F.3d 1207, 1225 (11th Cir. 2016) (citing *Hudson*, 231 F. 3d at 1294) ("Because Dr. Fowler did not violate Melton's constitutional rights, we need not reach the second prong of the qualified immunity inquiry.").

3.     **Claims Against Watkins**

a.     Federal Claims

i.     ***Substantive and Procedural Due Process***

35

Watkins moves for summary judgment on these claims using the same arguments made by the City. (*See* Doc. 61 at 32-33). Barr responds by relying on her same arguments. (*See* Doc. 63 at 34). The Court previously explained these arguments above.

Accordingly, the Court **GRANTS** summary judgment to Watkins on Barr's substantive and procedural due process claims.

## ii. *Qualified Immunity*

Watkins argues that he is "entitled to qualified immunity for the federal law claims." (*See* Doc. 61 at 31-32). Barr disputes this using the same arguments used against Henderson. (*See* Doc. 63 at 33-34). However, as the Court explained above, without a constitutional violation, it is unnecessary to proceed further.

## C. The Complaint Does Not State Claims Under the Fourth and Fifth Amendment

In her response to summary judgment, Barr discusses the Fourth and Fifth Amendments to the United States Constitution. (Doc. 63 at 18, 23-25, 27-28). In reply, Defendants argue that these claims were not brought in the Complaint. (*See* Doc. 68 at 5). They further argue that they had no notice of these claims. (*See id.*).

Since "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment[,]" this Court must determine if Barr brought Fourth and

Fifth Amendment claims in her Complaint. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312 (11th Cir. 2004) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996)). While Barr briefly mentions the Fourth and Fifth Amendments in paragraph two of her Complaint, she did not plead a claim under either of those constitutional provisions. (*See* Doc. 1-1 at ¶2). As the Defendants correctly point out, claims under the Fourth or Fifth Amendment simply do not appear in any of the counts. (*See* Doc. 68 at 6 n.7). Accordingly, since the Complaint never pled a claim arising under the Fourth or Fifth Amendment, the Court need not discuss them any further.

### D.   The Court Declines To Exercise Discretion Over the Remaining State Law Claims

Since the Court granted summary judgment to Henderson and Watkins on the federal constitutional due process claims, all that remains are state claims brought under Alabama state law. There is no remaining, independent basis for federal jurisdiction over those claims because they do not arise under federal law and the parties are not diverse. (*See* Doc. 1-1 at 3-5). The Court has carefully considered the issue and, in its discretion, declines to exercise supplemental jurisdiction over these state law claims.

The statute on supplemental jurisdiction states:

**(c)** The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--

> **(1)** the claim raises a novel or complex issue of State law,
>
> **(2)** the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> **(3)** the district court has dismissed all claims over which it has original jurisdiction, or
>
> **(4)** in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. §1367(c). "Once any of these factors is satisfied, the district court possesses the discretion to dismiss supplemental claims and must 'weigh ... at every stage of the litigation,' whether to dismiss the supplemental claims." *Ameritox, Ltd. v. Millennium Laboratories, Inc.*, 803 F.3d 518, 532 (11th Cir. 2015) (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).This decision is reviewed for an abuse of discretion. *See id.*; *Estate of Owens v. GEO Group, Inc.*, 660 F. App'x 763, 777 (11th Cir. 2016) (describing the discretion given to district courts as "broad"). District courts have been encouraged to dismiss state law claims brought under supplemental jurisdiction. *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) (citing *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984)) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

In its discretion, the Court declines to continue to exercise supplemental jurisdiction over the state law claims and finds that a remand is the appropriate course of action. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1123 (11th Cir. 2005) (citing *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1267 (11th Cir. 2001)) ("Because this case was originally filed in state court and removed to federal court pursuant to 28 U.S.C. § 1441, if the district court declines to continue to exercise supplemental jurisdiction, [plaintiff's] remaining claim should be remanded to state court.").

In reaching this decision, the Court considers the several factors central to its discretion. *See Ameritox, Ltd.*, 803 F.3d at 532. "Where § 1367(c) applies, considerations of judicial economy, convenience, fairness, and comity may influence the court's discretion to exercise supplemental jurisdiction." *Baggett v. First Nat. Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997). All factors point toward a remand.

A remand will not hinder judicial economy. The case has been pending for less than two years with less than 80 docket entries. A state court could easily rule on the remaining state law questions and try the case, if necessary. Additionally, a remand to the state court will not inconvenience any party. The state court is right down the street from the federal court, and the case would be tried in a single forum. *See*

*Ameritox*, 803 F.3d at 518. This case started in state court, and that is where it belongs now.

A remand is not unfair to any party. The Defendants knew when they removed the case that the state law claims hinged on supplemental jurisdiction. *Cf. Ameritox*, 803 F.3d at 539 (citing sources) ("[E]very litigant who brings supplemental claims in court knowingly risks the dismissal of those claims"). The Defendants based their removal on the presence of the federal claims. (*See* Doc. 1 at 2). Now that those claims are dismissed, the Court's primary reason to continue to hear this case is also gone. The state court is in the best position to decide the rest of this case.

Most importantly, comity counsels in favor of a remand here. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966). "State courts, not federal courts, should be the final arbiters of state law." *Baggett*, 117, F.3d at 1353 (citing *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir. 1992)); *see also Gibbs*, 383 U.S. at 726 n.15 (quoting another source) ("'[F]ederal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation.'").Here, a state court will have the chance to make these calls on the state law claims. This case will be

remanded.

## V.    CONCLUSION

In conclusion, the Court **ORDERS** the following:

• The Motion To Strike Evidentiary Material is **GRANTED** in part and otherwise **DENIED**. (Doc. 70).

• The City of Center Point is **GRANTED** summary judgment on all federal claims. Thomas Henderson and John Watkins are **GRANTED** summary judgment on all federal claims. The remainder of the motion is **CARRIED** with the case on **REMAND** to the Circuit Court for Jefferson County, Alabama. (Doc. 61).

• Barr's state law agency claim against the City is hereby **DISMISSED with prejudice**. (Doc. 63 at 23 n.2).

• Florence Johnson's and Trina Paulding's Motion for Summary Judgment is **CARRIED** with the case on **REMAND** to the Circuit Court for Jefferson County, Alabama. (Doc. 62).

• The Motions To Strike the justification affirmative defenses are **CARRIED** with the case on **REMAND** to the Circuit Court for Jefferson County, Alabama. (Docs. 65, 66).

• In conclusion, the remainder of this case is hereby **REMANDED** to the

Circuit Court for Jefferson, County, Alabama.

**DONE** and **ORDERED** this the 15th day of May, 2018.

**VIRGINIA EMERSON HOPKINS**
United States District Judge